IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Daija Jackson, Sharobin White,    *
Latoya Idlebird, Dinah Clark,    *
Nakeysha Boniaby, Janey Williams,  *
Denesha Joseph, Lawanda Douglas,  *
Amanda Williams, Shirley Andrews,  *
Rodney Bob, Alexis Joseph,    *
Misty Joseph,        *
   Plaintiffs,      *
v.            *  No.
             *
The United States Department of   *
Housing and Urban Development,   *
and          *
DM Arbor Court, LTD.     *
   Defendants.     *

## COMPLAINT

**Introduction.**

1.The Plaintiffs are current tenants at Arbor Court Apartments or tenants displaced from Arbor Court Apartments by the dangerous conditions in and around the apartment complex. Arbor Courts is a U.S. Department of Housing and Urban Development (HUD) funded low income rental housing project also known as Skyway Apartments. The unit, project, site, and neighborhood conditions at Arbor Court are dangerous and unfit for family life and the presence of children. HUD has violated the law by not providing Plaintiffs with either decent, safe, and sanitary housing at Arbor Courts or a housing choice voucher and the related assistance needed to obtain housing in better conditions with the voucher.

2.The Arbor Court Apartments is located in the U.S. Corps of Engineers designated Floodway and has flooded several times. As a result of flooding from Hurricane Harvey in 2017,

1

the first floor apartments are vacant, uninhabitable and not secure. Plaintiffs and others reside on the second or third floor above the vacant first floor that is a shell structure lacking sheetrock or walls. The first floor is open, dangerous, and a place for vagrants. The City of Houston Fire Marshall has red-tagged the structure, deeming it a fire hazard. The entire project is not structurally sound and presents life-threatening conditions. In addition to other health and safety hazards, Arbor Court has widespread mold as well as insect and vermin infestations. The project is located in a high crime area. Three murders and another attempted murder took place at the project in 2015. HUD has full knowledge of these conditions.

3. The project is located in a predominantly Minority census tract. The tract is 3% White non-Hispanic, 50.5% Black or African-American, 44.5% Hispanic. The project is located in a census tract in which almost one-half of the people, 48.9%, are below poverty as reported by the 2016 U.S. Census American Community Survey data. 78.4% of the children under 5 years of age are below poverty and 65.8% of all children under 18 years of age are below poverty according to the same report.

4. The census tract has been a racially segregated, minority concentrated, high poverty tract for decades. The unit, project, and site conditions at the Arbor Court Apartments are substantially unequal to the unit, project, and site conditions HUD maintains at the PBRA projects located in predominantly White, non-Hispanic census tracts in the Houston metropolitan area.

5. The unit, project, and neighborhood living conditions violate the HUD contract with the owner. The conditions give HUD the clear right to end the contract and provide plaintiffs a housing choice voucher and the assistance to obtain decent, safe, and sanitary housing with the voucher. HUD has taken no action to provide plaintiffs and the other tenants with a housing choice voucher

or the necessary assistance to obtain decent, safe, and sanitary housing with the voucher.

6. HUD's refusal to provide the voucher assistance perpetuates racial segregation and imposes severe injuries on a Black or African-American population, the tenants at the complex. HUD's actions violate the discriminatory intent standard of the Fair Housing Act and the 5th Amendment of the U.S. Constitution. HUD's actions violate its obligation under 42 U.S.C. § 3608(e)(5) to prevent federal funding of low income housing in units, projects, and conditions that perpetuate racial segregation and that are not part of an ongoing and effective housing and community revitalization effort. There is no such effort underway for these units.

7. HUD's refusal to provide plaintiffs with tenant-based voucher assistance is a final agency action that violates HUD's legal obligations to provide habitable units and conditions at Arbor Court or to provide tenant-based voucher assistance to obtain another unit in better conditions.

8. Plaintiffs seek injunctive and declaratory relief requiring HUD to provide plaintiffs with the voucher and other assistance necessary to obtain housing in decent, safe, and sanitary conditions. Plaintiffs seek declaratory relief that HUD's actions perpetuate racial segregation in violation of 42 U.S.C. § 3604(a), 42 U.S.C. § 3608(e)(5), and the Fifth Amendment to the Constitution of the United States of America.

**Jurisdiction**

9. This Court has jurisdiction under 42 U.S.C. § 1331 and 42 U.S.C. § 3613(a)(1)(A). The right to judicial review and the waiver of sovereign immunity is pursuant to 5 U.S.C. § 702.

**Plaintiffs**

10. Twelve of the thirteen Plaintiffs are current residents at Arbor Court. Three of the

Plaintiffs were forced out of their Arbor Court unit by Hurricane Harvey flooding and their units remain uninhabitable. None of these Plaintiffs have been offered a tenant-based voucher to use for obtaining replacement housing in better conditions. Two are residing with family at Arbor Court. One resides with relatives elsewhere in Houston.

11.   Daija Jackson is a project-based Section 8 voucher recipient and has been a resident of Arbor Court Apartments since October 2016. She has two children, ages four (4) years old and one (1) year old. Less than a year after Ms. Jackson moved to Arbor Court Apartments, Hurricane Harvey struck the Houston area with incessant rains over the course of several days. In the midst of the hurricane, Ms. Jackson was in the home with her then 4-year-old son and newborn daughter when water began entering the apartment. The family lost all of its belongings in the rising waters including: toys, clothing, a washer/dryer set and a brand new, still unassembled crib Ms. Jackson had purchased for her infant daughter. In the wake of Harvey, Ms. Jackson and her children were forced to relocate to various hotels in the metropolitan area and then to a relative's home when her FEMA benefits concluded. Five months following the hurricane, Ms. Jackson was finally able to secure a second floor apartment in the Arbor Court complex. Nevertheless, Ms. Jackson continues to have concerns regarding the conditions of her apartment unit. She recently discovered that there was black mold present within the unit that remains unaddressed. In addition to the chronic issues in need of repair within the unit, Ms. Jackson is gravely fearful of the criminal activity that persists in the neighborhood surrounding the apartment complex. Ms. Jackson has observed several physical assaults on the grounds of the complex and has consistently heard gunshots immediately outside of her unit windows. Upon hearing the gunshots, it is not uncommon for Ms. Jackson to grab her young children and force them to the ground so that they avoid serious injury. Ms. Jackson

4

is employed at a local fast food restaurant and her limited income precludes her from acquiring an apartment in a safer, less flood-prone neighborhood. As a result, Ms. Jackson is anxious about the potential of future flooding at the complex and even more concerned about her family's safety due to the unceasing violent crime in the surrounding area.

12. Sharobin White is a project-based Section 8 voucher recipient and has been a resident of Arbor Court Apartments since 2014. She has two children, ages eight (8) years old and three (3) years old. Ms. White and her family resided on the first floor of the apartment complex in unit 261 until a rain event in April 2016 caused immense flooding throughout the complex. Ms. White and her two children suffered substantial personal property losses due to that flood including all of her furniture, clothing, washer/dryer set, television set and toys for her children. She also lost her only means of transportation, a 2008 Chevrolet Malibu. Following that event, Ms. White moved to the second floor of the apartment complex. Subsequent to that move, in August 2017, Hurricane Harvey drenched the Houston area with heavy rains and Arbor Court Apartments flooded again. During that flood, Ms. White lost a second vehicle, a 2006 Chevrolet Impala. In addition to the consistent flooding that has plagued the complex, Ms. White has considerable concerns about the rampant violent crime that consistently threatens her and her children's safety within the complex and its surrounding neighborhood. It is not uncommon for Ms. White to grab her children and huddle over them when she hears gun shots outside of her window. Ms. White recently finished classes to complete a Patient Care Technician program and as a result has no employment income at this time. Due to her significantly limited income, she is unable to move her family to a safer neighborhood outside of the 100-year flood plain without governmental assistance. Ms. White is greatly apprehensive of remaining a resident at Arbor Court Apartments

as she is fearful of losing another vehicle to the unpredictable flooding and is even more fearful regarding her family's safety in the high-crime neighborhood surrounding the complex.

13. Latoya Idlebird is a project-based Section 8 voucher recipient and has been a resident of Arbor Court Apartments since 2012. She is the mother of two children, ages seven (7) years old and 9 months old. Ms. Idlebird was a resident in the complex during the extensive rain event that occurred in April 2016. Her third floor apartment unit was spared from flooding but Ms. Idlebird lost her sole means of transportation, a Mercury Grand Marquis. About 16 months later, Hurricane Harvey pounded the Houston area with heavy rains and Ms. Idlebird rode out the storm as she observed the first floor of the complex flood for a second time. In addition to the anxiety related to the unpredictable flooding, Ms. Idlebird has several other outstanding maintenance issues in her unit. She has reported to management that there is rampant mold and mildew in her living room and both bedrooms. She has also reported that a large crack in the sheetrock has formed within her unit and she is concerned about the area's structural integrity. Ms. Idlebird has reported these issues to management on two to three occasions and has received no response. Even with the persisting maintenance issues inside of her unit, Ms. Idlebird is most troubled by the ceaseless violence that plagues the complex and its surrounding neighborhood. Ms. Idlebird observes assaults or hears gunshots outside of her unit at least two to three times a week. The gunshots are particularly alarming to her and her small children. When she hears gunshots booming outside of her unit, she quickly brings both children into a bedroom without a window to protect them. Ms. Idlebird is unable to earn wage income at this time due to caring for her infant child; as such, she cannot afford to live in an area less prone to flooding and rampant violence without housing assistance. Ms. Idlebird continues to experience anxiety related to the persistent maintenance issues and

6

unpredictable violence at Arbor Court Apartments.

    14.  Dinah Clark is a 67 year-old, disabled project-based Section 8 voucher recipient. She has been a resident of Arbor Court Apartments for over 20 years. Ms. Clark was a resident in the complex during the extensive rain event that occurred in April 2016. As a result of that event, Ms. Clark's first floor apartment became submerged with water and she lost all of her personal property including: furniture, clothing, shoes, and pots and pans. Subsequent to the flooding, the unit was uninhabitable and Arbor Court's management did not offer Ms. Clark a different unit. She was forced to temporarily relocate to her daughter's apartment within the same complex until her unit was repaired. In August 2016, Ms. Clark returned to her first floor unit. Approximately one year later, in August 2017, Hurricane Harvey pounded the Houston area with heavy rains and Ms. Clark's apartment completely flooded once again. For a second time, Ms. Clark lost all of her personal possessions that were located within her apartment. She applied with FEMA for rental assistance to relocate elsewhere but was denied. She is currently appealing that decision. Arbor Court's management offered her a unit at a different property outside of the Houston area but Ms. Clark was forced to decline because she would have become ineligible for Houston's METROLift service. Ms. Clark is heavily dependent upon this transportation service so that she can attend her doctor's appointments. Without any other place to go, Ms. Clark was forced to move into her daughter's third floor unit once again. This living arrangement presents several difficulties for Ms. Clark. Most significantly, Ms. Clark has considerable mobility issues due to problems with her right knee and left hip. She typically relies on a walker to aid in ambulating. It is immensely painful for Ms. Clark to navigate the three flights of stairs to her daughter's apartment due to her medical conditions. Moreover, as there is limited space in her daughter's unit, Ms. Clark has been relegated

to sleeping in a chair for the last 11 months. In addition to remaining displaced from her unit, Ms. Clark is also concerned about the criminal activity that plagues the complex and its surrounding neighborhood. Ms. Clark recalls shootings that took place immediately outside of her former unit. She regularly hears gunshots at night and often crouches inside of the bathroom on the floor until they cease. Ms. Clark's sole income is Supplemental Security Income and she is unable to afford another unit in safer, less flood prone area without the assistance of a voucher.

15. Nakeysha Boniaby is a project-based Section 8 voucher recipient and has been a resident of Arbor Court Apartments since September 2014. She is the mother of three children, ages six (6) years old, five (5) years old and three (3) years old. Ms. Boniaby was also a resident in the complex during the extensive rain event that occurred in April 2016. Her family resided in a first floor unit and lost all of their personal possessions as a result of the flooding during that storm. Among the items lost in the flood were the family's clothing, furniture, toys, shoes, kitchen items and beds. Ms. Boniaby also lost her sole means of transportation, a 1999 Toyota Camry. Subsequent to the flood, the family was displaced from the unit and Arbor Court's management advised Ms. Boniaby that there were no other units available for rent. As a result, the family was forced to stay with relatives. After about three months, in August 2016, Ms. Boniaby's unit was repaired and the family returned to the first floor of the complex. Approximately one year later, Hurricane Harvey's rains produced extensive flooding in the Houston metro area and Arbor Court Apartments flooded once again. Ms. Boniaby's unit was once again overcome with flood water and the family lost the possessions they had only recently replenished. Ms. Boniaby also lost another vehicle, a 2002 Honda Accord. In the wake of Hurricane Harvey, Ms. Boniaby and her three small children remain displaced from the complex; they are currently residing with relatives.

8

She contacts the management office weekly but has been repeatedly told that there is no availability of other units at this time on the premises. In addition to the persistent flooding that Ms. Boniaby and her young children have endured at Arbor Court Apartments, they also observed constant criminal activity on the grounds of the complex and in the surrounding neighborhood. Ms. Boniaby and her kids would hear gunshots almost nightly. Upon hearing the shooting, Ms. Boniaby would gather her children into one room in order to shield them from potential stray bullets. Although Ms. Boniaby remains apprehensive about returning to Arbor Court Apartments due to the persistent flooding and violent crime, her modest income precludes her from finding an apartment in a safer area without the assistance of a housing voucher.

16. Janey Williams is a disabled project-based Section 8 voucher recipient. She has been a resident of Arbor Court Apartments since 2010. She resides there with her 22 year old daughter. Ms. Williams was a resident in the complex during the extensive rain event that occurred in April 2016. Ms. Williams' first floor apartment completely flooded during that event and she lost all of her personal property, including: beds, a television, clothing, shoes, a washer/dryer set and several pieces of furniture. Subsequent to that event, the apartment was not habitable and Ms. Williams had no stable place to live for several months. The management at Arbor Court apartments did not immediately assist Ms. Williams in acquiring another unit on the premises. As a result, Ms. Williams stayed with family and friends for about four months until another unit on the first floor of the property became available to lease. In August 2016, Ms. Williams moved back to Arbor Court Apartments. Approximately one year later, Hurricane Harvey brought incessant rains to the Houston area and Arbor Court Apartments flooded once again. Consequently, Ms. Williams lost all of her personal property once more. She was also displaced from her residence for a second

time. Following Harvey, with the assistance of a local charity, Ms. Williams was able to live in a hotel for about two months. She then moved into another apartment complex temporarily until Arbor Court's management finally advised her that a second floor unit was available in December 2017. Still, Ms. Williams' second floor apartment has been plagued with maintenance issues, including: mold, a leaking air conditioner and rat infestation. Ms. Williams has contacted management to perform maintenance on her unit on several occasions but the issues are never fully resolved. In addition to the persistent flooding and maintenance issues, Ms. Williams is also apprehensive about the ceaseless violence in the complex and its surrounding neighborhood. She hears gunshots consistently and often rushes into a hallway and drops to the floor when she hears multiple gunshots. Ms. Williams' sole income is Supplemental Security Income and her limited means render her unable to move into a safer, less flood prone area without a housing voucher.

17. Denesha Joseph is a project-based Section 8 voucher recipient. She has lived in Arbor Court Apartments since 2010 or 2011. She lives in a residence with her fiancée and her nine (9) year old, five (5) year old and one (1) year old children. Ms. Joseph is expecting another child this September. Ms. Joseph and her family were residents of Arbor Court Apartments during the April 2016 rain event. During that event, the family lost their sole means of transportation, a 2002 Pontiac Grand Prix. About sixteen months later, Hurricane Harvey pounded the Houston area with heavy rains. Fortunately, Ms. Joseph was able to move her current vehicle from the area prior to the complex flooding a second time. In addition to the anxiety related to the persistent flooding, Ms. Joseph and her family are consistently dealing with maintenance issues within the unit, including rampant mold in bathroom and window sills and periodic brown water from the pipes. When Ms. Joseph contacts management, maintenance comes to address the issues, but they are

never fully remediated. Ms. Joseph and her family are most concerned about the rampant violence that permeates the complex and the surrounding area. The family consistently hears gunshots in the area; a bullet once penetrated their patio door causing it to shatter. Ms. Joseph's limited income precludes her and her family from moving to a safer complex without the assistance of a housing voucher.

18. Lawanda Douglas is a project-based Section 8 voucher recipient. She has lived in Arbor Court Apartments since April 2016. She lives with her 15 year old son. Ms. Douglas moved into Arbor Court Apartments shortly before the extensive rain event that flooded the first floor units. Fortunately, she lived on the second floor during that storm. Ms. Douglas also resided at Arbor Court Apartments during Harvey. Although Ms. Douglas avoided the personal property losses from the flooding that took place in the complex, she has consistently had maintenance issues within her unit. Her unit has rampant mold, broken kitchen cabinets and an unstable toilet that is not secured to the floor. When Ms. Douglas has requested repairs, she has been threatened with additional fees for those repairs so she no longer contacts the management office regarding her issues. Moreover, Ms. Douglas is ever concerned about the violent crime and safety issues that persist at the complex. Her vehicle has been vandalized three times. Once, when her older son came to visit, someone shot a bullet into his vehicle's tire. Perhaps the most disturbing incident that Ms. Douglas experienced is when a bullet came through her unit and became lodged in her refrigerator door. Even though Ms. Douglas and her younger son continuously experience a significant level of anxiety residing in the complex, their limited income precludes them from moving elsewhere without the assistance of a housing voucher.

19. Amanda Williams is a project-based Section 8 voucher recipient. She has lived in

Arbor Court Apartments since 2012. She lives in her residence with her eight (8) year old, six (6) year old and two (2) year old children. Ms. Williams and her family were residents of Arbor Court Apartments during the April 2016 rain event. During that event, the family lost their sole means of transportation, a 2006 Chevrolet Impala. When Hurricane Harvey pounded the Houston area with heavy rains the family lost a second vehicle, a 2001 Chevrolet Monte Carlo. In addition to losing two cars in the flooding at the complex, Ms. Williams and her family have had to endure chronic maintenance issues. Her unit has rampant mold in her bathtub that deems it necessary to be replaced and an insect infestation in the refrigerator. The complex's maintenance representatives have visited her unit seven or eight times this year, but the issues remain unresolved. Moreover, Ms. Williams is concerned about the violent crime ever present in the complex and the surrounding neighborhood. She and her children often hear gunshots and she gathers them into one room away from windows to protect them from potential stray bullets. Ms. Williams' limited income precludes her from moving to a safer, better maintained apartment without the assistance of a housing voucher.

20.  Shirley Andrews is a project-based Section 8 voucher recipient. She has been a resident of Arbor Court Apartments since 1999. Ms. Andrews has survived four floods since she began her residency at Arbor Court. In 2001, her first floor unit flooded due to the heavy rains associated with Tropical Storm Allison. In 2003, her unit flooded as a result of rains associated with an unnamed storm. Hurricane Rita caused flooding again in 2005. Ms. Andrews' apartment flooded one last time in 2008 following Hurricane Ike. Subsequent to the flooding from that storm, she was finally able to secure a second floor unit at the apartment complex. In each of those floods, Ms. Andrews lost most, if not all, of her personal property. Even though Ms. Andrews is now in a

second floor unit that is unlikely to flood, she continues to endure maintenance issues in the complex. Most significantly, her unit has structural issues which are apparent from the wood creaking when she walks across the floor. Management is aware of this issue but it has not been rectified. In addition to the persistent flooding that Ms. Andrews has endured, she is also apprehensive about the rampant violence present at the complex. When she hears gunshots, she goes to the bathroom in order to avoid a potential stray bullet. Ms. Andrews has continued to tolerate repeated flooding and maintenance issues due to her inability to afford another unit in a safer, less flood prone area, without the assistance of a housing voucher.

21.  Rodney Bob is a project-based Section 8 voucher recipient. He has been a resident of Arbor Court Apartments since 2013. He resides there with his thirteen year old daughter. Mr. Bob was a resident at Arbor Court during the April 2016 rain event that brought about significant flooding. As a result of that flood, Mr. Bob and his daughter lost their sole means of transportation, a 1985 Oldsmobile. When the complex flooded again during Hurricane Harvey, the family lost another vehicle, a 2006 Chevrolet Trailblazer. As a result of these two floods, Mr. Bob and his daughter are anxious that another flood could occur without warning. Mr. Bob is also concerned about he and his daughter's safety in the complex. He has observed that there is very little security and that the complex is accessible to anyone at any time. He describes hearing gunshots in the complex and its surrounding neighborhood at least a few times per month. When this occurs, he and his daughter move to an area of the complex without windows to avoid injury. Mr. Bob's sole income is Social Security Disability. As such, he is unable to move to a more secure, less flood prone residence without the assistance of a housing voucher.

22.  Alexis Joseph is a project-based Section 8 voucher recipient. She has been a resident

of Arbor Court Apartments since December of 2016. Less than a year after she moved to the complex, Hurricane Harvey deluged the Houston area with several inches of rain. Ms. Joseph's first floor unit flooded as a result and she lost all of her personal property including: a bed, sofa, televisions, clothes and shoes. In addition, Ms. Joseph became displaced from her unit. She temporarily received housing assistance from FEMA but that has ended. Almost one year has elapsed since the hurricane struck and Ms. Joseph remains displaced from her apartment. She is currently residing with relatives in another unit within the complex. The management at Arbor Court offered her placement at an apartment complex in Conroe, Texas but Ms. Joseph declined due to its lengthy distance from her employer. Over a month ago, Ms. Joseph was told she would be placed into a new apartment imminently, but she has not signed a lease as of yet.   In addition to the anxiety related to being displaced as a result of the flooding, Ms. Joseph remains apprehensive about the persistent crime and violence that is rampant at the complex and in its surrounding neighborhood. Prior to and since her apartment flooded, Ms. Joseph frequently heard gunfire near her unit and would often run to the bathroom and contact police until it subsided. Ms. Joseph's limited employment income deems her unable to move to a less dangerous environment without the assistance of a housing voucher.

23.  Misty Joseph is a project-based Section 8 voucher recipient. She has been a resident of Arbor Court Apartments since the Fall of 2016. She resides there with her one (1) year old child. Less than a year after Ms. Joseph moved to Arbor Court, the complex flooded as a result of Hurricane Harvey's torrential rains. Ms. Joseph's first floor unit completely flooded and she lost all of her personal possessions, including: furniture, a bed, her child's crib, televisions, clothing and shoes. She and her young child were displaced from the apartment for about four months until

the end of 2017. Ms. Joseph is extremely anxious about future flooding at the complex as she cannot afford to replace her personal property again. In addition to the risk of flooding, Ms. Joseph is significantly disturbed by the ceaseless violence that plagues the complex and its surrounding area. She hears gunshots at least once a week. At such times, she grabs her young child and takes them to hide in the restroom until gunfire ceases. Ms. Joseph's limited employment income precludes her from moving to a safer neighborhood without the assistance of a housing voucher.

**Defendants**

24.  The Defendant is the United States Department of Housing and Urban Development, an executive agency of the United States government. Defendant's refusal to provide the tenant based voucher assistance is a final agency action for which there is no other adequate remedy in a court. Defendant's refusal to issue the voucher to plaintiff is final agency action. Only the Defendant can cause the issuance of a voucher and the other assistance for plaintiffs to leave the Arbor Court project and obtain decent, safe, and sanitary housing using the voucher. A lawsuit against the owner cannot provide this relief.

25.  Defendant DM Arbor Court LTD is the record owner of Arbor Court. Disposing of this action in this Defendant's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

**Facts**

26. The HUD low income rental assistance program at issue in this case is the Project Based Rental Assistance (PBRA) program.

27.  HUD's 2017 Picture of Subsidized Households reports that HUD paid the owner of the Arbor Court project at the rate $2,435,496 a year to lease the units to plaintiffs and the other tenants at rents that do not exceed 30% of the tenants' household income. The tenants pay approximately 30% of their income in additional rent to the owner at the rate of approximately $440,000 per year. HUD and the project tenants have been paying substantial amounts of money to the owners of the project since 5/8/1991.

28.  The contract between HUD and the owner explicitly requires the owner to maintain the units in decent, safe, and sanitary conditions. The conditions include HUD's physical condition standards for HUD housing that is decent, safe, sanitary and in good repair. 24 C.F.R. § 5.703.

29.  The unit, site, project, and neighborhood conditions at the Arbor Court project do not meet HUD standards for those factors. The dangerous and otherwise substandard conditions at the project include the following conditions:

30.  The project was completely flooded in 2016 and in 2017. Parts of the site have flooded more frequently. The project is located in a flood plain and approximately one-half of the project is located in the channel of the adjacent Green Bayou, a floodway. The drainage is poor. 24 C.F.R. § 5.703(a), (f) (natural hazards).

31.  The units on the first floor of every building are uninhabitable and uninhabited because of the flooding and the poor drainage. These units are vacant, hazardous, nuisances. 24 C.F.R.§ 5.703(a), (f) (natural hazards).

32.  The mold caused by the flooding in the first floor units has spread to the occupied upper floor units, a condition that violates housing quality standards. 24 C.F.R.§ 5.703(f).

33.  There are infestations of insects and rats in the project and in individual units. The units

are not habitable, secure, or structurally sound. 24 C.F.R.§ 5.703.

34.  The City of Houston Fire Marshal has red-tagged the project and required the posting of a fire watch. The City Code prohibits the collection of any rent until the hazard is abolished. Houston City Code, Sec. 10-302. - Acceptance of rent prohibited until hazard abolished. The landlord continues to charge and collect rent. The violation of the local code is also a violation of 24 C.F.R.§ 5.703(g).

35.  The conditions of the units, the project, and the site at Arbor Court Apartments pose imminent health and safety hazards to residents in violation of 24 C.F.R.§ 5.703.

36.  These conditions have been open and obvious and are undeniable notice of the existence of the hazards. The owner had many opportunities to cure but did not.

37.  HUD has consistently renewed the contract with the current and previous owners of the Arbor Court project.

38.  HUD has the legal and contractual obligation to either provide units that are decent, safe, sanitary, in good repair, and in compliance with housing quality standards or to provide the tenants with a housing voucher to move to another unit if the tenants choose. The legal obligation includes the obligation to determine whether the owner has materially failed to maintain the property according to the required housing quality standards. MAHRA Sec. 516 (a)(1)(A), (a)(2)(A) - (I).[1] Material failure includes materially failing to maintain the property according to housing quality standards after receipt of notice and a reasonable opportunity to cure. MAHRA

---

[1] The Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA), Title V of the HUD Fiscal Year 1998 Appropriations Act, Pub. L. 105-65, October 27, 1997.

Sec. 516 (a)(1)(A), (a)(2)(H). The housing quality standards are set out for various programs. 24 C.F.R. § 5.703(a) - (f).

39.  The ongoing contractual obligations require HUD to

> inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times ... as may be necessary to assure that the Owner is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition, including the provision of the agreed-upon utilities and other services. [HUD] shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination. 24 C.F.R.§ 886.323(d).

40.  Once the owner is in default of the obligation to provide habitable units, HUD must require a remedy. That remedy includes the issuance of tenant based vouchers and other assistance to the tenants choosing to move to another unit. 24 C.F.R.§ 886.323(e); CONSOLIDATED APPROPRIATIONS ACT, 2018, PL 115-141, March 23, 2018 , 132 Stat 348.

41.  HUD has the obligation to issue vouchers:

•   to provide tenant-based assistance for families occupying units formerly assisted under a terminated PBRA contract. 42 U.S.C. § 1437f(z)(1)(A).

•   after notice that owner has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the owner fails to take corrective action within the time specified.   HUD shall provide assistance in finding such a unit for a family that wishes to be rehoused in another dwelling. 24 C.F.R.§ 886.323(e).

•   after the owner has engaged in material adverse financial or managerial actions or omissions with regard to such project and HUD has refused to renew the contract. MAHRA Sec. 516 (a)(1)(A). Material adverse financial or managerial actions or omissions include--

> (B) materially breaching a contract for assistance under section 8 of the United States Housing Act of 1937, after receipt of notice and an opportunity to cure;

. . .
(H) materially failing to maintain the property according to housing quality standards after receipt of notice and a reasonable opportunity to cure. MAHRA Sec. 516(a)(2).

42. HUD has breached its obligation to either provide units that are decent, safe, sanitary, in good repair and in compliance with housing quality standards or to provide the tenants with a housing voucher to move to another unit if the tenants choose. 24 C.F.R.§ 886.307 [24 C.F.R.§ part 5 subpart G]; 24 C.F.R.§ 5.703; 24 C.F.R.§ 886.318, 24 C.F.R.§ 886.323, HUD, Section 8 Renewal Policy Guidebook, Issued: 06/30/2017, §§ 11-1(c), 11-2(B), 11-3. The remedies include providing the tenants such as plaintiffs with tenant based assistance (a voucher) or other assistance. 42 U.S.C.A. § 1437f(z)(1)(A);.

43.  HUD's refusal to take these remedial actions is the refusal to take actions required by law.

44.  HUD's renewals of the PBRA contracts are final agency actions that are arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right, and short of statutory right.

45.  HUD's refusal to provide Plaintiffs with the tenant based voucher and other assistance necessary to obtain assisted housing is final agency action that is unlawfully withheld, arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right, and short of statutory right.

**Prima facie case of disparate treatment based on race**

46.  Plaintiffs will show the following facts to make out a prima facie case of discrimination by presenting facts that give rise to an inference of discrimination by HUD.

47.  HUD contracts with private landlords to provide affordable housing to low income

tenants through the Project Based Rental Assistance program (PBRA). Pursuant to the contract, HUD makes payments to the landlord to rent the units to eligible low income tenants. HUD has the contractual authority to require that the landlord comply with the HUD housing quality standards that govern this housing program.

48. Plaintiffs are African-American. Arbor Courts is located in a 3% White non-Hispanic census tract. Arbor Court's units are 95% occupied by Black or African-American households. HUD did not provide Plaintiffs with decent, safe, and sanitary housing.

49. Plaintiffs entered into a lease for the HUD subsidized PBRA housing at Arbor Court that, had it met the HUD housing quality standards, would have provided them and their families with decent, safe, and sanitary housing. The Plaintiffs' lease for the HUD subsidized PBRA housing at Arbor Court would have provided them and their families with equal neighborhood living conditions without conditions that adversely affect the health, safety, and general welfare of residents.

50. The unit, project, and site conditions that do not comply with minimum standards for decent, safe, and sanitary housing are:

The project is located in the Floodway of Greens Bayou;

The project has flooded twice since 2016;

The first floor units are uninhabitable and uninhabited because of flood damage;

The second floor units in which Plaintiffs and other tenants live are uninhabitable because of mold and other damage to the units.

51. The neighborhood living conditions that adversely affect the Plaintiffs and other Arbor Court tenants including the risk of flooding are factors that adversely affect the health, safety, and

general welfare of residents, and cannot be mitigated by HUD. These factors include significantly deteriorated surrounding neighborhood conditions with flooding, high crime rates, and lack of public community services needed to support a safe and healthy living environment for the residents of Arbor Court.

52. HUD does provide similarly situated, predominantly White non-Hispanic low income tenants in majority White non-Hispanic census tracts with PBRA housing in neighborhood living conditions that are free from environmental and other conditions that adversely affect the health, safety, and general welfare of the area residents. Six of these PBRA units are in The Woodlands. All six PBRA properties in The Woodlands are in census tracts with White non-Hispanic populations of at least 64%. Four of PBRA projects in The Woodlands have a majority White non-Hispanic tenant population. Two of the properties in predominantly White non-Hispanic census tracts in The Woodlands, Wood Glen Apartments and Fawn Ridge Apartments, are 37% and 29% White non-Hispanic, respectively. These projects do not have significantly deteriorated surrounding neighborhood conditions with flooding, high crime rates, and lack of public community services needed to support a safe and healthy neighborhood living environment. The rents for the assisted units at these projects are comparable to the rents for the assisted units at Arbor Court

53. HUD does provide similarly situated White non-Hispanic low income tenants in majority White non-Hispanic census tracts with decent, safe, and sanitary PBRA housing. The decent, safe, and sanitary PBRA housing provided to predominantly White non-Hispanic low income tenants in majority White non-Hispanic census tracts are located in the adjoining suburb of the Woodlands. There are six PBRA projects in The Woodlands. None of the six are located in

a flood plain or a flood way. All of the units are in habitable condition and, except for normal turnover, are inhabited on a consistent basis.

54. HUD does provide similarly situated, predominantly White non-Hispanic low income tenants in majority White non-Hispanic census tracts with PBRA housing in neighborhood living conditions that are free from environmental and other conditions that adversely affect the health, safety, and general welfare of the area residents. These PBRA units are in the six PBRA projects in The Woodlands. These projects do not have significantly deteriorated surrounding neighborhood conditions with flooding, high crime rates, and lack of public community services needed to support a safe and healthy living environment. The Woodlands was initially funded by HUD as a HUD Title VII Urban Growth and New Community Development Act New Town beginning in 1972.

**HUD's refusal to provide Plaintiffs with PBRA housing equal to that provided to White non-Hispanic tenants is not based on any legitimate, non-discriminatory reason**

55. HUD has no statutory or regulatory authority for failing to provide Plaintiffs with the decent, safe, and sanitary housing required by the relevant housing quality standards. HUD has no statutory or regulatory authority for failing to provide Plaintiffs with housing in locations with neighborhood living conditions that are free from environmental and other conditions that adversely affect the health, safety, and general welfare of the area residents.

56. The City of Houston has denied the owner of Arbor Court the building permits needed to repair the flood damage. The City denied the permits because of the substantial damage to the buildings. The City of Houston Fire Marshall has red-tagged the project and required a Fire Marshall retained fire watch service at the site in order to protect the residents' lives and property. HUD has no legitimate reason for continuing to require Plaintiffs to accept these conditions in

order to receive the benefit of HUD housing assistance payments to Arbor Court. HUD's refusal to provide plaintiffs with decent, safe, and sanitary housing in locations free from serious adverse neighborhood living conditions is intentional racial discrimination.

**The additional evidence showing the existence of *Arlington Heights* factors supports the finding of intentional discrimination**

57. The U.S. Supreme Court set out a list on non-exclusive factors that may provide circumstantial evidence showing racial discrimination was a motivating factor in government decisions affecting the availability and location of housing. *Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977). The following evidence shows the existence of *Arlington Heights* factors that support the inference of intent. The facts show the HUD intentional support for racial segregation is longstanding in duration and pervades HUD's administration of the PBRA program in the City of Houston.

**HUD's refusal to provide Plaintiffs and the other residents of PBRA housing with equal housing and living conditions has the discriminatory effect of perpetuating racial segregation in PBRA units in the City of Houston**

58. Forty two of the 44 PBRA projects in the City of Houston are located in predominantly minority census tracts. The 42 PBRA projects in predominantly minority census tracts are adversely affected by various unequal neighborhood living conditions. The 42 PBRA projects in predominantly census tracts are disproportionately occupied by Black or African American low income tenants. The only two PBRA projects in White non-Hispanic Houston census tracts that would offer Plaintiffs a racially integrated housing opportunity in equal neighborhood conditions are restricted to elderly tenants only.

**HUD's refusal to provide Plaintiffs and the other residents of PBRA housing with equal housing and living conditions has the second discriminatory effect adversely affecting a disproportionately Black or African American group, the residents of PBRA in Houston**

59.  The tenant population of the 44 PBRA projects in the City of Houston is 71% Black, 8% White non-Hispanic, and 15% Hispanic or Latino. The tenant population of the 42 PBRA projects located in majority non-White census tracts is 74% Black, 6% White non-Hispanic, and 15% Hispanic or Latino.

**The historical background of the racial segregation and unequal conditions affecting PBRA and other HUD assisted housing in Houston reveals a series of actions taken for invidious purposes**

60.  The current concentration of PBRA housing in minority areas was originally approved by HUD in violation of HUD's own site selection regulations prohibiting just such racially segregated results.

61.  The unequal neighborhood conditions affecting the HUD PBRA housing in minority concentrated areas include high crime, high poverty including high childhood poverty, distressed neighborhoods, poor drainage, flooding, segregated and unequal schools, and lack of childhood opportunities.

62.  The injuries particularly to children from these conditions of racial segregation are foreseeable and were foreseen by HUD.

> Racially or ethnically concentrated areas of poverty merit special attention because the costs they impose extend far beyond their residents, who suffer due to their limited access to high-quality educational opportunities, stable employment, and other prospects for economic success. Because of their high levels of unemployment, capital disinvestment, and other stressors, these neighborhoods often experience a range of negative outcomes such as exposure to poverty, heightened levels of crime, negative environmental health hazards, low educational attainment, and other challenges that require extra attention and resources from the larger communities of which they are a part. Consequently, interventions that result in reducing racially and ethnically concentrated areas of poverty hold the promise of providing benefits that assist both residents and their communities. Affirmatively Furthering Fair Housing; Proposed Rule,78 Fed Reg 43710, 43714, July 19, 2013.

24

63.  The non-low income housing tax credit affordable housing in the City of Houston was developed, funded, and approved by HUD. HUD's site selection regulations prohibiting the concentration of HUD assisted in minority concentrated, low income areas with unequal living conditions were first enacted in 1972. 37 Fed. Reg. 203 (1972). The existing racial segregation in HUD assisted housing in the City of Houston was funded and approved by HUD decisions.

**The specific sequence of events keeping Plaintiffs in the dangerous and uninhabitable conditions at Arbor Court is consistent with the existence of discriminatory intent**

64.  HUD's refusal to provide Plaintiffs with a tenant based voucher after the second flood in two years supports a finding of intent.

65.  Arbor Court's location has been in a flood plain on the FEMA flood plain map since 1985. HUD accepted the project for PBRA subsidy in 1991. HUD standards in effect at the time made Arbor Court ineligible for PBRA because of the risks of flooding.

66. Arbor Court flooded in 2016. The first floor units were uninhabitable and remained uninhabited for months. HUD did not provide Plaintiffs with a tenant based voucher after this flood.

67.  HUD renewed the PBRA contract with Arbor Court after the 2016 flood even though the flood plain map shows Arbor Court in the floodway of Greens Bayou.

68.  Arbor Court flooded in 2017. The first floor units were uninhabitable and remain uninhabited. HUD did not provide Plaintiffs with a tenant based voucher after this flood. HUD continues to provide the PBRA subsidy for units at Arbor Court.

69.  HUD's actions are consistent with two elements of intentional discrimination. HUD's action are consistent with the intent that Black or African-American persons should not have equal housing and neighborhood conditions because they are Black or African-American. HUD's action

are consistent with the intent that providing assisted housing for Black or African American families in unequal conditions in minority areas for Black or African-American families is an acceptable alternative to providing affordable housing in majority White non-Hispanic areas.

**HUD's decisions to sell Arbor Court as a HUD assisted project in violation of HUD substantive standards are consist with and show the existence of discriminatory intent**

70. HUD has made the decision to sell Arbor Court to a new owner as a HUD assisted project twice since the HUD neighborhood conditions eligibility criteria were enacted in 1979. 24 C.F.R.§ 886.307(k) (until removed in 1998 at 63 Fed. Reg. 46575, 46580, 9/1/1998).

71. The eligibility criteria stated:

> (k) Site and neighborhood. . . .
> (1) Performance requirement. The site and neighborhood shall be reasonably free from disturbing noises and vibrations and other hazards to the health, safety, and general welfare of the occupants.
> (2)Acceptability criteria. The site and neighborhood shall not be subject to serious adverse environmental conditions, natural or manmade. such as dangerous walks, steps, instability, flooding, poor drainage, septic tank backups, sewage hazards, or mudslides; abnormal air pollution, smoke, or dust; excessive noise, vibration or vehicular traffic; excessive accumulations of trash: vermin or rodent infestation; or fire hazards. 24 C.F.R.§ 886.307(k)(1), (2) (subsequently modified at 63 Fed. Reg. 46575, 46580, 9/1/1998).

Arbor Court was subject to the serious adverse environmental conditions of flooding at the time of each HUD decision to dispose of the project as a HUD assisted project. Arbor Court was located in the 1985 official flood plain map which was prior to the second decision to sell the project with a Project Based Rental Assistance contract from HUD in 1991.

72. The decision to place housing for low income Black or African-American families in a location that will subject those families to the foreseeable risk of serious adverse environmental conditions is a decision consistent with and supportive of the racially segregative purpose to segregate Black or African-American families and provide them with unequal facilities.

**HUD's decisions to renew the PBRA contracts for Arbor Court were made in violation of HUD substantive standards are consistent with and show the existence of discriminatory intent**

73. HUD has made decisions to renew and to approve the assignment of the PBRA contracts for Arbor Court since 1984. Each of those decisions was made in violation of the HUD regulatory standards for acceptable housing. 24 C.F.R. § 886.307(k)(1), (2) (until 1998); 24 C.F.R.§ 5.703. These decisions are consistent with and supportive of the racially segregative purpose to segregate Black or African-American families and provide them with unequal facilities.

**HUD's failure to affirmatively further fair housing with regard to the PBRA program and Arbor Court is the violation of a substantive standard that is consistent with discriminatory intent**

74. HUD has the legal obligation under 42 U.S.C. § 3608(e)(5) to affirmatively further fair housing in all of its housing programs. This obligation requires HUD to take meaningful actions that:

- address significant disparities in housing needs and in access to opportunity,

- replace segregated living patterns with truly integrated and balanced living patterns,

- transform racially and ethnically concentrated areas of poverty into areas of opportunity, and

- foster and maintain compliance with civil rights and fair housing laws. *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 156 (1st Cir. 1987); *Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 819, 821-822 (3d Cir. 1970); 24 C.F.R.§ 5.150, § 5.152; HUD, Affirmatively Further Fair Housing, Final Rule, 80 Fed. Reg. 42272, July 16 2015.

75. HUD is aware of the history of de jure and de facto segregation in affordable housing

in the City of Houston. HUD knows that Houston is one of the most racially segregated cities in the United States and in 2012 was the most racially segregated city in Texas. HUD knows that Plaintiffs and other minority residents face challenges in seeking affordable housing outside areas of minority concentration. HUD letter to James D. Noteware, City of Houston, Director of Housing and Community Development, November 30, 2011 (City Analysis of Impediments to Fair Housing incomplete and unacceptable).

76.  Despite this knowledge, HUD has not taken meaningful action to affirmatively further fair housing in the PBRA program as administered with regard to the Arbor Court project. HUD's implementation of its legal obligation requires HUD to provide Plaintiffs with PBRA housing in neighborhood living conditions free from the environmental and other conditions that adversely affect the health, safety, and welfare of Plaintiffs and their families. If HUD had used its legal and contractual authority to require the provisions of equal quality housing at Arbor Court, one effect of the racial segregation would have been eliminated. However, the location of the project in the floodway is a major obstacle to this alternative. If HUD had used its legal and contractual authority to provide Plaintiffs with a tenant based voucher, Plaintiffs could use the voucher to obtain housing with equal unit conditions and with fewer adverse neighborhood living conditions. Plaintiffs could at least move out of the flood way. HUD took neither action to comply with its legal obligation to affirmatively further fair housing. HUD's violation of this obligation is consistent with discriminatory intent.

**Claims for relief**

77.  HUD's final agency action refusing to provide plaintiff and the other project residents with Housing Choice Vouchers and the other assistance needed to obtain affordable decent, safe,

and sanitary housing in neighborhoods without substandard conditions violates 42 U.S.C. § 3604(a). HUD's actions prevent plaintiffs from using vouchers to obtain dwellings in violation of 24 C.F.R. § 100.70(a).

78.  HUD's final agency action failing or delaying maintenance or repairs and the provision of units that fail to meet the standards of 24 C.F.R. § 5.703 rental dwellings because of race, color, religion, sex, handicap, familial status, or national origin violates 42 U.S.C. § 3604(b) and 24 C.F.R. § 100.65(b)(2).

79.  HUD's final agency action refusing to provide plaintiff and the other project residents with Housing Choice Vouchers and the other assistance needed to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions violates HUD's obligation to affirmatively further fair housing. 42 U.S.C. § 3608(e)(5).

80.  HUD's final agency action refusing to provide plaintiff and the other project residents with Housing Choice Vouchers and the other assistance needed to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions violates the equal protection principle of the Fifth Amendment to the U.S. Constitution.

81.  HUD's action refusing to provide plaintiff and the other project residents with Housing Choice Vouchers and the other assistance needed to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions is final agency action that violates HUD legal obligations under MAHRA Sec. 516 (a)(1)(A), (a)(2).

82.  Relief for Plaintiffs' claims is available under 5 U.S.C. § 706.

**Prayer for relief**

Plaintiff requests the following relief:

A. a preliminary injunction ordering HUD to temporarily abate the Section 8 contract with the owner of the project for plaintiff's unit and provide plaintiff with a housing choice voucher and the other assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions;

B. a final judgment ordering HUD to continue to provide plaintiffs with a housing choice voucher and the other assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions so long as plaintiffs remain eligible for the voucher;

C. a final judgment that Plaintiffs' leases with Arbor Court are terminated without any default by Plaintiffs and ordering a return of all funds paid by Plaintiffs as rent or deposits;

D. a declaratory judgment that HUD's refusal to provide plaintiffs with a housing choice voucher and the other assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions violated HUD's legal obligations pursuant to 42 U.S.C. § 1437f(z)(I)(A); CONSOLIDATED APPROPRIATIONS ACT, 2018, PL 115-141, March 23, 2018 , 132 Stat 348 the Consolidated Appropriations Act, 2018 (Public Law 115-141); MAHRA Sec. 516 (a)(1)(A), (a)(2); 24 C.F.R.§ 886.323(e). 42 U.S.C. § 3604(a); 24 C.F.R.§ 100.70(a); .42 U.S.C. § 3604(b); 24 C.F.R.§ 100.65(b)(2), 42 U.S.C. § 3608(e)(5); and the Fifth Amendment to the United States Constitution.

E. any other appropriate relief; and

F. an award of plaintiff attorney's fees, litigation expenses, and costs.

Respectfully Submitted,

*/s/Kimberly Brown Myles*

Kimberly Brown Myles
Attorney in charge
State Bar No. 24071805
Fed ID No.1098722
Martha Orozco
State Bar No. 00795569
Fed ID No. 24971
Velimir Rasic
State Bar No. 24065948
Fed ID No. 982815
LONE STAR LEGAL AID
P.O. Box 398
Houston, Texas 77001-0398
Telephone: (713) 652-0077 ext. 1206
Facsimile: (713) 652-3141
Email: kbrown@lonestarlegal.org
Email: vrasic@lonestarlegal.org
Email: morozco@lonestarlegal.org


Michael M. Daniel
State Bar No. 05360500
Fed ID No. 20079
Laura B. Beshara
State Bar No. 02261750
Fed ID No. 20080
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
E-mail: laurabeshara@swbell.net

Attorneys for Plaintiffs

31